**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BERND H. REIMANN, Derivatively on Behalf of PLUG POWER, INC., <br><br> Plaintiff, <br><br> v. <br><br> GEORGE C. McNAMEE, GARY K. WILLIS, MAUREEN O. HELMER, GREGORY KENAUSIS, KYUNGYEOL SONG, KAVITA MAHTANI, MARK BONNEY, PATRICK JOGGERST, ANDREW J. MARSH, and PAUL B. MIDDLETON, <br><br> Defendants, <br><br> and <br><br> PLUG POWER, INC., <br><br> Nominal Defendant. | Case No.:   1:26-cv-1020 (MAD/DJS) <br><br><br> **DEMAND FOR JURY TRIAL** |

**<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

Plaintiff Bernd H. Reimann ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Plug Power Inc. ("Plug Power" or the "Company"), file this verified shareholder derivative complaint against the Individual Defendants (defined below) for breaches of their fiduciary duties as directors and/or officers of Plug Power and other wrongdoing as alleged herein. Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Company's public documents, conference calls and announcements made by the Company and the Individual Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases

1

published by and regarding Plug Power, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. Plug Power presents itself as a leader in the hydrogen industry, developing and marketing fuel cell systems and related technologies. Plug Power's revenue streams include sales of hydrogen fuel cell systems related infrastructure and equipment, services performed on fuel cell systems and related infrastructure, Power Purchase Agreements (PPAs), and fuel delivered to customers. A significant portion of its revenue is generated through long-term agreements with customers who use Plug Power's hydrogen fuel cells in warehouses and distribution centers. These contracts obligate Plug to supply hydrogen fuel, but historically Plug Power has lacked the ability to produce sufficient liquid hydrogen by itself. Plug Power has been forced to purchase liquid hydrogen from third-party suppliers at high cost and resell it to customers at a loss, creating sustained negative margins on its fuel delivery business.

2. To address these losses and better support its operations, Plug Power announced plans to build a network of green hydrogen production facilities across North America, beginning with a 15 tons-per-day ("TPD") liquid hydrogen plant in Woodbine, Georgia (the "Georgia Plant"). The Georgia Plant was described by the Individual Defendants (defined below) as central to Plug Power's strategy to vertically integrate hydrogen production, reduce reliance on third-party suppliers, improve its negative fuel margins, and serve as a model for additional plants in Texas, and New York.

3. The Georgia Plant carried particular significance because Plug Power represented that it would be the first facility to use Plug Power's own electrolyzers to produce hydrogen that would then be liquefied and delivered to customers. The Company repeatedly

2

told investors that the plant would begin producing liquid hydrogen in the second quarter of 2023 and emphasized that the project was being executed on a compressed timeline relative to industry norms, presenting it as evidence of Plug Power's execution capabilities. These claims were highly material to analysts and investors because the sooner Plug Power could produce its own hydrogen, the sooner it could stop relying on third-party suppliers and start operating under profitable margins. The Individual Defendants claimed that their "internal production of green hydrogen" would have a "transformational effect" on Plug Power's margins.

4.      The Individual Defendants' representations about the Georgia Plant and Plug Power's progress towards generating liquid hydrogen were materially false and misleading. At the time they were made, critical construction and commissioning steps at the Georgia Plant were incomplete, and the Individual Defendants knew or recklessly disregarded that the promised June 2023 deadline was not achievable. Furthermore, during this time period, Plug Power faced financial and operational difficulties, including chronic failures to pay vendors and contractors on time, resulting in delayed delivery of critical parts. These undisclosed funding issues further impeded Plug Po's ability to meet its promised timeline and contradicted their public statements about their ability to internally produce hydrogen and bring operating margins in line with publicly stated targets.

5.      Rather than disclose these material facts, the Individual Defendants continued to assure the market that production was imminent, even after missing the June 2023 deadline. In August 2023, the Individual Defendants shifted the target to that month, attributing the missed deadline to summer heat and minor productivity issues. In October and November 2023, after failing to meet the promised August 2023 deadline, the Individual Defendants again represented that the plant was in its final steps and would be online by year-end. In reality, the Georgia Plant did not begin producing liquid hydrogen until January 2024, seven months after the originally promised deadline.

6.      Further, Plug Power was facing critical cash flow shortages during the relevant period that prevented it from paying its third-party suppliers and receiving components integral for operations across its entire business. Plug Power's inability to obtain necessary components delayed construction at the Georgia Plant, prevented it from completing commissioning, and stopped it from successfully producing liquid hydrogen. This was known by Plug Power's senior executives, including Marsh, based on the fact that they regularly visited the Georgia Plant and witnessed that it was not producing liquid hydrogen at levels necessary to support the 15 TPD targets they provided to the public. Notwithstanding, the Individual Defendants repeatedly provided the market with progress reports and promises concerning the Georgia Plant's supposed imminent production of hydrogen that consistently failed to materialize.

## JURISDICTION AND VENUE

7.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a). This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

8.      This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including defendants'

primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (iv) defendants have otherwise purposefully availed themselves of this District through issuing false statements in this District.

10.     In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

### Plaintiff

11.     *Plaintiff Bernd H. Reimann* is a current shareholder of Plug Power, having held his Plug Power shares since February 2021, and who will continue to hold Plug Power shares throughout the pendency of this action.   Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.   Plaintiff is a citizen of New Mexico.

### Nominal Defendant

12.     Plug Power is a Delaware corporation with its principal executive offices at 968 Albany Shaker Road, Latham, New York, 12110. Plug Power's shares trade on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "PLUG."   Nominal Defendant is a citizen of New York and Delaware.

### Director Defendants

13.     *Defendant Andrew J. Marsh* ("Marsh") was the CEO of the Company having served in this role since April 2008 until March 2026. Defendant Marsh currently serves as Chairman of the Board.  Defendant Marsh is a citizen of New York.

14.     *Defendant George C. McNamee* ("McNamee") has been a director of the Company since 1997.  Defendant McNamee is a member of the Compensation Committee, Nominating and Corporate Governance Committee ("N&G Committee"), the Regulatory Affairs Committee, and the Merger & Acquisition/Strategy Committee ("M&A Committee"). Defendant McNamee is a citizen of New York.

15.     *Defendant Gary K. Willis* ("Willis") has been a director of the Company since March 2003.  Defendant Willis is the Chair of the Compensation Committee and a member of the Audit Committee, N&G Committee, Regulatory Affairs Committee, and M&A Committee. Defendant Willis is a citizen of Connecticut.

16.     *Defendant Maureen O. Helmer* ("Helmer") has been a director of the Company since January 2004. Defendant Helmer is the Chair of both the N&G Committee and Regulatory Affairs Committee and is a member of the Audit Committee.  Defendant Helmer is a citizen of New York.

17.     *Defendant Gregory Kenausis* ("Kenausis") has been a director of the Company since 2013.  Defendant Kenausis is the Chair of the M&A Committee and a member of the Audit Committee and Compensation Committee.  Defendant Kenausis is a citizen of Connecticut.

18.     *Defendant Kyungyeol Song* ("Song") has been a director of the Company since February 2021.  Defendant Song is a member of the M&A Committee.  Defendant Song is a citizen of New York.

19.    ***Defendant Kavita Mahtani*** ("Mahtani") has been a director of the Company since April 2022. Defendant Mahtani is a member of the Audit Committee and M&A Committee. Defendant Mahtani is a citizen of New York.

20.    ***Defendant Mark Bonney*** ("Bonney") has served as a Company director since 2023. He also serves as the Chair of the Audit Committee and as a member of the Regulatory Affairs Committee.  Defendant Bonney is a citizen of Florida.

21.    ***Defendant Patrick Joggerst*** ("Joggerst") has served as a Company director since July 2023. He also serves as a member of the Compensation Committee and the Corporate Governance and Nominating Committee.  Defendant Joggerst is a citizen of District of Columbia.

22.    The above-named defendants at ¶¶ 13-21 above are referred to herein as the "Director Defendants."

**Officer Defendants**

23.    ***Defendant Paul B. Middleton*** ("Middleton") is the CFO of the Company, having served in this role since December 2014.  Defendant Middleton is a citizen of New York.

24.    The above-named defendants at ¶¶ 13 and 23 above are referred to herein as the "Officer Defendants."

25.    The Officer Defendants and Director Defendants are collectively referred to herein as the "Individual Defendants."

**Confidential Witnesses**

26.    The amended complaint in the factually related securities class action, captioned *In re Plug Power Inc. Securities Litigation*, Case No.: 1:24-cv-00406-MAD-DJS (N.D.N.Y.) (the "Securities Class Action"), in the United States District Court for the Northern District of New York incorporates statements from confidential former employees ("FEs") of Power Plug

who offered their experiences. The following are the confidential former employees attained the Securities Class Action and whose statements are referenced throughout this complaint before this court and are based upon information and belief.

27.    FE1 was employed at Plug Power as Senior Manager of Manufacturing from 2021 to 2024.  FE1 was responsible for implementing standard operating procedures ("SOP"), sale inventory system, structured operational planning programs, organizing plant layouts, optimizing operational flow, and addressing other existing operational issues. In the role as Senior Manager of Manufacturing FE1 led manufacturing for hydrogen fuel cell self-assemblies, supervised Plug Power's storage systems and electrolyzers, and new product introduction. FE1 reported to David Mindnich ("Mindnich"), Executive Vice President of Global Manufacturing of Power Plug, who in turn reported directly to Defendant Marsh.

28.    FE2 was a contractor and consultant on behalf of Plug Power from 2022 to 2023. FE2, on behalf of Plug Power, assembled fuel test stands, oversaw installation and connections, and worked on hydrogen pads.  FE2 stopped working for Plug Power when payments from Plug Power ceased, resulting in roughly $500,000 in remaining unpaid invoices.  FE2 attempted to contact Plug Power about payment but was unsuccessful.

29.    FE3 was employed by Plug Power as a Senior Floor Supervisor at the Company's Vista Plant from 2021 to approximately March 2023.  FE3 was responsible for setting up the Vista facility, supervising managers and operations, constructing assembly lines to improve the efficiency of the battery assembly, and managing the shop floor.  FE3 reported to Chris Kenny (Senior Director of Manufacturing Operations).

30.    FE4 was employed by Plug Power from June 2022 to August 2024 as an Officer Manager and Senior Administrative Assistant.  FE4 worked at Power Plug's West Concord, Massachusetts Electrolyzer Facility.  FE4 was responsible for running the Success Program Manufacturer floor, office tasks, planning events, onboarding new employees, and supporting

vice presidents with updates and projects. FE4 reported to Noelle DiPietro, Manager Executive Administration and previously to Cortney Mittelsteadt ("Mittelsteadt"), VP Electrolyzer Technology.

31.    FE5 was previously employed at Plug Power as Director of Business Development-Stationary Storage from September 2021 to February 2024 and reported first to Daren Painer, Vice President of Sales-Stationary Power, and later, Jose Luis Crespo, then Vice President of Global Sales and now Chief Security Officer. FE5's responsibilities encompassed the sale of large-scale hydrogen fuel cell systems, including working with Energy Vault to develop a Resilient Energy Center in Calistoga, California. FE5's primary focus at Plug Power was executing a sale for the largest hydrogen fuel cell system in U.S. history with Energy Vault. Energy Vault was developing a Resilient Energy Center in Calistoga, California.

32.    FE6 was employed by Plug Power from June 2023 to March 2025, first as the Commercial Finance Manager, and later as Senior Product Manager- Product Analytics. FE6's job duties were in both aspects of finance and product strategy. These responsibilities included analytical tool development, pricing strategy design, cost reduction initiatives, and supply agreement management. FE6 also interacted with data using PowerBI, Vena, and SAP from Plug Power's Enterprise Resource Planning system. While in his role as Commercial Finance Manger, FE6 reported to Jerry Cahill (Vice President of Finance), who reported directly to Defendant Middleton. FE6 also reported to Tony Sinkevich (Vice President of Finance). While working as Senior Product Manager, FE 6 reported to Glen Benson (Senior Systems Engineer).

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

33.    By reason of their positions as officers, directors, and/or fiduciaries of Plug Power and because of their ability to control the business and corporate affairs of Plug Power, the Individual Defendants owed Plug Power and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were required to use their utmost ability to control and

manage Plug Power in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Plug Power and its shareholders so as to benefit all shareholders equally.

34.     Each director and officer of the Company owe to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

35.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Plug Power, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

36.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

(a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company

10

maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations;

(f)    Ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

37.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

38.     Each of the Individual Defendants, by virtue of their position as directors and/or officers of the Company, owed to the Company and to its stockholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Plug Power, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

39.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Plug Power and were at all times acting within the course and scope of such agency.

## CORPORATE GOVERNANCE

40.     At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

41.     Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

42.     In a section titled, "Individual Responsibility," the Company's Code of Conduct states that it "sets forth expectations to help guide the actions and behaviors of all employees

in our organization . . . . Additionally, the Code of Conduct is expected to be upheld by non-employee members of the Board of Directors[.]"

43. The Code of Conduct further states, under "Communication," in relevant part:

As a publicly traded company, our organization must also comply with a variety of regulations that promote transparency in financial markets and the accuracy of information shared with the investment community. The reports and documents that we file with or furnish to the Securities and Exchange Commission, and our earnings releases and similar public communications made by our organization, must include fair, timely and understandable disclosure.

44. In addition, the Code of Conduct states under "Conducting Business with Customers, Suppliers and Others," in relevant part:

It is incumbent upon each member of our organization to ensure that we operate fairly, openly, ethically, lawfully and honestly with these important stakeholders. No director, officer or employee should take unfair advantage of another person in business dealings on Plug Power's behalf through the abuse of privileged or confidential information or through improper manipulation, concealment or misrepresentation of material facts.

45. Under "Privacy and Confidentiality," the Code of Conduct provides that "[d]irectors, officers and employees shall use confidential information solely for legitimate Company purposes."

46. Moreover, under "Accuracy of Company Records," the Code of Conduct states:

Our organization prepares and utilizes a variety of documents and records in the course of doing business. Specific examples include: financial reports, employee timecards, expense reports, corporate books, contracts and a variety of other such documents and records. These documents and records are critical to help guide business decision making while also having financial implications to business operations. Our organization also utilizes both internal and external auditor partners to validate the integrity, reliability and accuracy of Company records As such, Plug Power employees are responsible to ensure the integrity of these records by contributing accurate and timely data. No director, officer or employee may cause Plug Power to enter into a transaction with the intent to document or record it in a deceptive or unlawful manner. In addition, no director, officer or employee may create any false or artificial documentation or book entry for any transaction entered into by Plug Power. Any purposeful falsification of Company documents will be considered as misconduct and will lead to disciplinary action up to and including termination of employment.

47.    In a section entitled "Compliance with Laws, Rules and Regulations," the Code of Conduct states, in relevant part:

Plug Power seeks to conduct its business in compliance with both the letter and the spirit of applicable laws, rules and regulations. No director, officer or employee shall engage in any unlawful activity in conducting Plug Power's business or in performing his or her day-to-day Company duties, nor shall any director, officer or employee instruct others to do so.

If you become aware of the violation of any law, rule or regulation by the Company, whether by its directors, officers, employees, or any third party doing business on behalf of the Company, it is your responsibility to promptly report the matter to your supervisor or to the Compliance Officer.

48.    Finally, the Code of Conduct provides that "[a]ll employees are obliged to report possible violations of law, the Code of Conduct or any other Company policy or procedure."

**Audit Committee Charter**

49.    The Audit Committee Charter states that, among other purposes, one of the Audit Committee's purposes is to "oversee the accounting and financial reporting processes of the Company, the audits, and the integrity of the Company's financial statements."

50.    In a section entitled "Audited Financial Statements and Annual Audit," the Audit Committee is given the following responsibilities:

- The Audit Committee shall review the overall audit plan with the Independent Auditors and the members of management who are responsible for preparing the Company's financial statements, including the Company's Chief Financial Officer and/or principal accounting officer or principal financial officer (the Chief Financial Officer and such other officer or officers are referred to herein collectively as the "Senior Accounting Executive").

- The Audit Committee shall review and discuss with management (including the Company's Senior Accounting Executive) and with the Independent Auditors the Company's annual audited financial statements, including (a) all critical accounting policies and practices used or to be used by the Company, (b) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to the filing of the Company's Annual Report on Form 10-K, and (c) any significant financial reporting issues that have arisen in connection with the preparation of such audited financial statements

- The Audit Committee must review:

(i) any analyses prepared by management and/or the Independent Auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements. The Audit Committee may consider the ramifications of the use of such alternative disclosures and treatments on the financial statements, and the treatment preferred by the Independent Auditors. The Audit Committee may also consider other material written communications between the Independent Auditors and management, such as any management letter or schedule of unadjusted differences;

(ii) major issues as to the adequacy of the Company's internal controls including any special audit steps adopted in light of material control deficiencies;

(iii) major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

(iv) the effects of regulatory and accounting initiatives, as well as off-balance sheet transactions and structures, on the financial statements of the Company.

* * *

- If brought to the attention of the Audit Committee, the Audit Committee shall discuss with the CEO and CFO of the Company (1) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and (2) any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting

51. Under a section entitled "Unaudited Quarterly Financial Statements", the Audit Committee "shall discuss with management and the Independent Auditor, prior to the filing of the Company's Quarterly Reports on Form 10-Q, (1) the Company's quarterly financial statements and the Company's related disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," (2) any such issues as may be brought to the Audit Committee's attention by the Independent Auditors pursuant to Statement on Auditing Standards No. 100, and (3) any significant financial reporting issues that have arisen in connection with the preparation of such financial statements."

15

52.     With respect to "Earnings Press Releases," the Audit Committee "shall discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies, including, in general, the types of information to be disclosed and the types of presentations to be made (paying particular attention to the use of "pro forma" or "adjusted" non-GAAP information)."

53.     The Audit Committee, as provided under a section entitled "Regular Reports to the Board," shall regularly report to and review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Independent Auditors, the performance of the internal audit function and any other matters that the Audit Committee deems appropriate or is requested to review for the benefit of the Board."

54.     The Audit Committee may also discuss with management legal matters (including pending or threatened litigation) that may have a material effect on the Company's financial statements or its compliance policies and procedures.

## SUBSTANTIVE ALLEGATIONS

### Background

55.     Plug Power develops and sells hydrogen fuel systems, and related infrastructure. Its business spans the hydrogen supply chain: (i) manufacturing proton exchange membrane ("PEM") electrolyzers that use electricity to separate hydrogen from water; (ii) selling hydrogen fuel cells, devices that convert hydrogen into usable energy for industrial and stationary power applications; and (iii) providing hydrogen fuel to customers under long-term contracts.

56.     Plug Power's revenue streams include sales of hydrogen fuel cell systems related infrastructure and equipment, services performed on fuel cell systems and related infrastructure, Power Purchase Agreements ("PPAs"), and fuel delivered to customers. A

significant portion of its revenue is generated through long-term agreements with customers such as Amazon and Walmart, which use Plug Power's hydrogen fuel cells in warehouses and distribution centers. These contracts obligate Plug Power to supply hydrogen fuel, but historically the Company has lacked the ability to produce sufficient liquid hydrogen by itself. Plug Power has been forced to purchase liquid hydrogen from third-party suppliers at high cost and resell it to customers at a loss, creating sustained negative margins on its fuel delivery business.

57.    To address these losses, Plug Power announced a "vertical integration" strategy beginning in 2019. This plan focused on producing green hydrogen through its own electrolyzers, liquefying it at dedicated facilities, and distributing it through its network of customers.  Central to this strategy was the construction of several liquid hydrogen plants across the United States.  The first and most important of these projects was the 15-tons-per-day ("TPD") liquid green hydrogen plant in Woodbine, Georgia (the "Georgia Plant"). Plug Power promoted the Georgia Plant as a model facility that would demonstrate its ability to build and operate hydrogen production on a large scale, reduce reliance on third-party suppliers, and materially improve hydrogen fuel margins.

58.    The Georgia Plant carried particular significance because Plug Power represented that it would be the largest facility to use Plug Power's own electrolyzers to produce hydrogen that would then be liquefied and delivered to customers. The Company repeatedly told the market that the plant would begin producing liquid hydrogen in the second quarter of 2023 and emphasized that the project was being executed on a compressed timeline relative to industry norms, presenting it as evidence of Plug Power's execution capabilities. Plug Power further identified the Georgia Plant as a "roadmap" for future facilities, meaning its success or failure would directly influence the feasibility of the Company's broader

17

hydrogen build-out.  For these reasons, the status and timing of the Georgia Plant were material to investors evaluating Plug Power's business model and financial outlook.

**Hydrogen Production Timelines**

59.    In 2021, Plug Power announced plans to construct multiple liquid hydrogen facility across North America, including a 15 TPD liquid green hydrogen facility in Woodbine Georgia, the Georgia Plant.  The Georgia Plant was a cornerstone of the Company's strategy to vertically integrate hydrogen production, reduce reliance on third-party suppliers, improve its fuel margins, and "reinforce Plug's dominance in green hydrogen."

60.    When fully constructed, the Georgia Plant would utilize eight 5-megawatt electrolyzers designed to split water into hydrogen and oxygen before liquefying the hydrogen and then transporting it to fueling stations. Plug Power promoted construction of the Georgia Plant based on its use of vertical integration; specifically, Plug Power intended to use components manufactured in-house or at other facilities owned by Plug Power to complete construction of the Georgia Plant.  This included, in pertinent part, the electrolyzers used to create the liquid hydrogen that were assembled at Plug Power's Vista Technology Park facility in Slingerlands, New York.

61.    Plug Power repeatedly told investors that the Georgia Plant would begin producing 15 TPD of liquid hydrogen by the second quarter of 2023.  Specifically, on the May 9, 2023 earnings call, Plug Power stated: "our plants [are] already producing gases hydrogen for our customers, and we [expect] to achieve full production by the end of June . . . I'm going to be walking Georgia today, I'm excited."

62.    In its May 2023 investor presentation, the Company listed the Georgia Plant as "Georgia 1st 15TPD – Q2 '23." On June 14, 2023, just two weeks before the promised completion date, Defendant Marsh stated: "So I'm walking Georgia with the Head of S&P…

So the important item is Georgia will be putting out liquid at the end of the month, and I can't wait."

63. The Company tied the Georgia Plant's compressed timeline to its financial performance. In its various communication with investors, including earning calls and press releases, Plug Power stated that once operational, the Georgia Plant would materially reduce the Company's negative fuel margins by replacing high-cost third-party hydrogen purchases with in-house production. The Company further identified the Georgia Plant as the template for additional facilities across the United States, such as Texas and New York, meaning the project's success was critical not only to near-term margins but also to the viability of Plug Power's broader build-out plan.

64. The Company also presented the Georgia Plan's compressed timeline as evidence that Plug Power could execute faster and more efficiently than the rest of the hydrogen industry. The Company portrayed this speed as part of Plug's core competitive advantage and a key reason for investors to believe in Plug Power's ability to meet its ambitious production and profitability targets.

65. However, the accelerated schedule represented by the Company was not feasible and the Individual Defendants knew or recklessly disregarded this. Building a liquid hydrogen plant requires extensive permitting, construction, and commissioning, including equipment reviews and the installation and testing of liquefiers and cold box systems. Plug Power's own disclosures noted that the industry standard for such plants was approximately four years. By claiming it would complete the Georgia Plant in a year or less, the Company touted a timeline that was unattainable in practice and materially misleading to investors.

66. By June 30, 2023, the end of Q2, the Georgia Plant was not producing liquid hydrogen. Key components, including the liquefaction system, remained in commissioning throughout the third and fourth quarters of 2023. Nevertheless, the Company did not disclose

19

that the June 2023 target had been missed and instead continued to reassure investors that final commissioning was underway. On August 9, 2023, Plug Power stated that "we are going to be producing liquid here in the month of August. We're very much looking forward to hosting you all on August 23, and we're essentially wrapping up the plant at this point in time." Plug Power attributed the delays to reduced productivity due to heat levels and utilizing learnings from other sites.

67.    On August 23, 2023, Plug Power made no announcement that the Georgia Plant had begun producing hydrogen.

68.    On October 11, 2023, Plug Power again assured investors that progress was being made: "[w]e're continuing to see progress at our Georgia plant, and we are finishing the last step in the construction process, commissioning the liquefier. We expect the plant to be online by year-end," providing no substantive explanations for the further delay.

69.    It was not until January 23, 2024 that Plug Power finally announced that its Georgia Plant had started production of liquid green hydrogen that month. This disclosure confirmed that the project was delayed by approximately seven months from the June 2023 deadline the Company had repeatedly presented and affirmed.

**Operations and Cash Flow Problems**

70.    In addition to the unrealistic accelerated timeline, Plug Power was also facing serious internal and financial challenges that made timely completion of the Georgia Plant even less feasible. Former employees have confirmed that the Company struggled with cash flow and vendor management during the relevant period.

71.    FE1 was previously employed at Plug as Senior Manager of Manufacturing from 2021 to 2024 and reported to the David Mindnich, the Executive Vice President of Global Manufacturing at Plug, who in turn reported directly to CEO Marsh. FE1's job duties include implementing standard operating procedures ("SOP"), sales inventory system, and structured

operational planning programs, organizing plant layouts, and optimizing operational flow, and addressing other existing operational issues. FE1 led manufacturing for hydrogen fuel cell self-assemblies, new product introduction, and oversaw Plug's storage systems and electrolyzers. FE1's team established hydrogen plant infrastructure and new production processes.

72.    According to FE1, Plug Power was not paying its vendors. FE1 complained, making multiple calls to the relevant departments within Plug Power but received no responses or follow-up communications. Mindnich was also aware of the situation and, according to FE1, did his best to convey the message to others, including Marsh.

73.    FE1 indicated that there were periods when vendors were not receiving payments, resulting in Plug Power's inability to obtain necessary parts for battery cell assembly. Contrary to this, Plug Power attributed delays in parts delivery to efforts in establishing new suppliers, supply chain challenges in China, and issues with local or nationwide supplier chain redundancy. Although the official communication suggested these issues were being addressed, parts shortages were interfering with operations and led to shutdowns of manufacturing lines.

74.    Plug Power experienced a shortage of hydrogen fuel due to non-operational plants in Georgia and Tennessee. The elevated cost of externally sourced hydrogen further impacted profitability. According to FE1, CEO Marsh and CFO Middleton prioritized substantial quarterly bonuses, allocating funds to themselves while limiting resources available for supply procurement, investment in hydrogen facilities, vendor payments, or meeting customer requirements. The operational impact on FE1's plants, coupled with the fact that the Georgia and Tennessee hydrogen plants under development were not yet functional (thereby requiring Plug to continue sourcing hydrogen externally), demonstrated that Plug Power was behind schedule.

75.    Regular internal updates regarding pending production from Georgia and Tennessee were expected but were never issued.  In June 2023, FE1, who lived near Plug Power's Tennessee plant, visited the site to see why Plug Power was purchasing hydrogen elsewhere while supposedly operating its own facility.  FE1 found only one staff member there, who explained the plant was not running because of unresolved issues and was waiting for funding to fix them. The plant was completely non-operational.  As Senior Manager of Manufacturing, FE1 felt compelled to visit the plant to investigate.  FE1 mentioned that the fuel was essential for operating the plants; it was needed for testing internal vehicles and running leak checks prior to selling and shipping any product.  FE1 said the Tennessee plant lacked funds for full operations, ran partially, then shut down.  Plug Power was still waiting for funding after FE1 left in 2024.  According to FE1, the Georgia plant suffered from the same lack of funding.

76.    FE2 was a contractor and consultant for Plug from 2022 to 2023.  FE2's job duties included assembling fuel test stands, overseeing installation and connections, and working on hydrogen pads.  FE2 stopped working for Plug Power after the Company stopped paying FE2 with approximately $500,000 left in unpaid invoices.  FE2's payment inquiries were ignored or met with automated phone responses, and calls to procurement and accounting were unsuccessful.  There was nobody offering to help get FE2 paid, and no department helped.

77.    FE2 explained that Plug Power faced challenges due to insufficient funds to pay vendors or contractors.  During 2023, financial resources were insufficient to acquire parts. This situation occurred around 2023, coinciding with Plug Power cybersecurity breach after which the Company paid a ransom, according to FE2. During this period, accounts were inaccessible, preventing payments.

78.    FE2 attempted to help Plug Power by covering certain costs and/or ordering parts through FE2's purchasing contracts with other vendors.  For example, on one occasion, a

flatbed truck from Buffalo arrived with parts but refused to make the delivery without receiving payment, which Plug Power could not provide. FE2 resolved the issue by writing a check instead.  In another example, FE2 described work at Plug Power's Kodak Park facility that ultimately was completed by outside sources.  To complete the necessary installations, project materials were sourced through Conquest, not Plug Power.  Moreover, when Schlage Locks reduced service to Plug Power, FE2 maintained the relationship via a shared salesperson.

79.    Despite FE2's efforts to support Plug Power, the Company faced cash flow problems and unpaid vendors which led to operational problems, according to FE2.  For example, FE2 stated that work on the fuel cell test stands was delayed due to vendor non-payment issues. FE2 explained that Plug Power ceased payments, which resulted in the vendor discontinuing deliveries.  FE2 connected approximately half of the test stands but then ran out of money and shifted their focus to different installations.  Fuel cell test stands were utilized for testing dual cells prior to shipment.

80.    FE3 was previously employed at Plug Power as a Senior Floor Supervisor at the Vista Plant from 2021 to approximately March 2023 and reported to Chris Kenny, Senior Director of Manufacturing Operations. FE3's job duties included setting up the Vista facility, managing the shop floor, overseeing managers and operations, and constructing assembly lines improving battery assembly efficiency.

81.    FE3 explained that Plug Power's senior management made decisions without accounting for feedback from ground operations.  For example, FE3 recalled that battery assembly parts could no longer be purchased and later learned this was because Plug Power stopped paying vendors. FE3 explained that, without the parts there would be no batteries. Suppliers informed FE3 via email that they were ceasing shipments of additional parts until outstanding invoices were paid, which resulted in production being halted.

82.    According to FE3, Plug Power delayed the Georgia plant's production to late 2023, finally starting in early 2024, which FE3 attributed to funding issues and insufficient infrastructure.  FE3 also questioned where batteries were being produced since the Vista plant was not producing much.  FE3 recalled sales announcements with major customers but doubted Plug Power could meet their commitments.

83.    FE3 explained that operational challenges arose from slowed production and insufficient workload. FE3 also observed recurring equipment quality issues. Components were hastily assembled, resulting in problems such as leaking stacks.  Rather than thoroughly inspecting the units, faulty parts were repeatedly replaced without adequate checks.  According to FE3, the answer would be "just put another stack in." Quality issues persisted due to technical problems and insufficient procedures. Jodie McCaughey, Production Engineering Manager, opposed verifying unit performance before assembly.  FE3 pushed for inspections and closing purchase orders only after checks to prevent selling poor-quality products that could harm Plug Power's reputation.

84.    FE3 recalled receiving orders from Stellantis; however, Plug Power could not meet the demands. Further, Plug Power did significant business with Amazon, selling units with full-life warranties.  When some batteries failed, Plug Power retrieved them and supplied loaners, though most were unreliable.  FE3 estimated that out of 1,000 units sold to Amazon, 200 would fail, and Plug Power lacked the capacity to replace all of them.  In addition to the batteries, Plug Power also had manufacturing problems with its electrolyzers.  FE3's team lead was present at the location where employees worked on the electrolyzers who observed numerous issues during assembly, which often required the team to reassemble components after failures. FE3 questioned whether Plug Power had the capacity to build electrolyzers. FE3 also noted there was no long-term testing conducted on the units.  The electrolyzers consistently malfunctioned.

85.     FE4 was previously employed at Plug as an Office Manager and Senior Administrative Assistant from June 2022 to August 2024 and reported to Noelle DiPietro, Manager Executive Administration and previously to Cortney Mittelsteadt, VP Electrolyzer Technology. FE4 worked at Plug Power's West Concord, Massachusetts, Electrolyzer Facility. FE4's job duties included managing office tasks, planning events, running the Success Program Manufacturer floor, onboarding new employees, and supporting vice presidents with updates and projects.

86.     FE4 believed that CEO Marsh and CFO Middleton made promises about hydrogen production quantities from the Georgia and Tennessee plants that they could not keep. According to FE4, Mittelsteadt told both Marsh and Middleton their timeline was unrealistic. Mittelsteadt shared these concerns directly with FE4. Mittelsteadt also told FE4 that Plug Power's public hydrogen production forecasts were highly unrealistic and unattainable. Mittelsteadt expressed no confidence in the figures, disagreed with Marsh, and openly challenged him on these issues, according to FE4.  When discussing the Tennessee and Georgia projects with FE4, Mittelsteadt expressed no confidence in Plug Power and stated upon resigning that the Company was failing.  FE4 said further that VP Monjid Hamdan and others shared these concerns, openly discussing them in meetings. Notwithstanding, during internal "Town Hall" style meetings, Marsh claimed that current operational problems would be resolved but the problems continued to remain unresolved.  FE4 observed that the West Concord facility incurred costs shipping electrolyzers back and forth due to unresolved problems. Additionally, inexperienced engineers had to troubleshoot on site, resulting in downtime and lost business.

87.     FE4 described ongoing issues at Plug Power's West Concord facility stemming from primarily a lack of technical expertise and recurring assembly errors with electrolyzers, including incorrect sizes and hydrogen components. Many products failed engineering tests

and needed troubleshooting.  According to FE4, electrolyzers are complex, requiring millions of parts. VP of Engineering Monjid Hamden faced difficulties stemming from non-payments to vendors for these parts, which resulted in order fulfillment issues and continued past due notices up to the time when FE4 ended employment with Plug Power. The main challenge voiced by employees during monthly "success meetings," which were attended by technical staff and management, was sourcing parts since electrolyzers required specific manufacturing methods and Plug Power needed vendors to supply key components.

88.     FE5 was previously employed at Plug Power as Director of Business Development-Stationary Storage from September 2021 to February 2024 and reported first to Daren Painer, Vice President of Sales-Stationary Power, and later, Jose Luis Crespo, then Vice President of Global Sales and now Chief Security Officer. FE5's responsibilities encompassed the sale of large-scale hydrogen fuel cell systems, including working with Energy Vault to develop a Resilient Energy Center in Calistoga, California.

89.     FE5's primary focus at Plug Power was executing a sale for the largest hydrogen fuel cell system in U.S. history with Energy Vault.  Energy Vault was developing a Resilient Energy Center in Calistoga, California.  FE5 said his project with Energy Vault was well behind schedule. Plug Power promised Energy Vault customer delivery that the Company knew was unattainable, as the hydrogen fuel cells had not even been designed at the point of sale.  Instead, Plug Power sold an untested product before production began, starting design only after missing the promised delivery date to Energy Vault.

90.     FE5 explained that Energy Vault remained with Plug Power despite complaints because Plug Power's product was the only large system available.  FE5 added that overruns on cost were significant. FE5 asserted that Plug Power lacked the resources to design and deliver as promised because it lacked workforce and could not pay its vendors. FE5 raised concerns through reporting line but stated that management took no action.

91.     FE6 was employed by Plug Power from June 2023 to March 2025.  FE6 served as the Commercial Finance Manager before transitioning to Senior Product Manager - Product Analytics.  While in Finance, FE6 reported to Jerry Cahill, VP of Finance, who reported directly to CFO Paul Middleton. FE6 also reported to Tony Sinkevich, VP of Finance.  While Senior Product Manager, FE6 reported to Glen Benson, Senior Systems Engineer.   FE6 had responsibilities in both finance and product strategy, including pricing strategy design, analytical tool development, cost reduction initiatives, and supply agreement management. FE6 worked with data using PowerBI, Vena, and SAP from Plug's ERP system. FE6 also focused on pricing value propositions, tool strategies, cost road mapping, and product management.

92.     FE6 explained that delays at the Georgia and Tennessee plants were due to quality and engineering issues.  For example, FE6 described that production delays were attributable to substantial problems with the Cold Box (a core mechanical component used to liquify hydrogen production).  FE6 said the team faced significant challenges getting the Cold Box operational at the Georgia plant.  Additionally, Plug Power faced challenges with operation management control.  The previous plants they opened prior to Georgia and Tennessee were developed as natural gas facilities, which differ significantly from building a hydrogen plant.

93.     As time elapsed during construction, the scope of the Georgia plant project changed from the original plan but, according to FE6, Plug Power lacked the expertise to connect the Cold Box, which was challenging to assemble.  Converting hydrogen gas to liquid for shipment proved difficult and Plug Power needed a suitable apparatus to facilitate liquefaction of the hydrogen.  FE6 participated in internal leadership talks about the hydrogen production timeline.  The discussions focused on how to achieve the required temperature to produce hydrogen, and what temperature they were currently on.  FE6 described the process of

trying to get to the right temperature as trial and error and believed that Plug Power was "in over their heads."

**MATERIAL MISSTATEMENTS AND OMISSIONS**

94.    The Individual Defendants knew or recklessly disregarded that the projected timeline was not feasible. The Georgia Plant was a core project at the center of Plug Power's vertical integration strategy and financial turnaround plan.  The Individual Defendants were directly responsible for monitoring its progress, assessing its feasibility, and communicating accurate information to investors. Furthermore, the magnitude of the delay, more than half a year beyond the promised date, further supports the fact that the Individual Defendants knew or recklessly disregarded the infeasibility of the timeline, especially given Plug Power's own acknowledgment of the industry-standard timeline of approximately four years and objections to the timeline voiced by other members of Plug Power's senior management, including VP Mittelsteadt and VP Monjid Hamdan.  It was the Officer Defendants' core responsibility to track, predict, and disclose material developments at the Georgia Plant.  By continuing to tout imminent production while omitting the fact that Georgia Plant remained far from complete, the Individual Defendants caused the Company to mislead investors about both Plug Power's operational capabilities and its near-term margins in addition to other key financial metrics.

**1Q23 Quarterly Report**

95.    On May 9, 2023, Plug Power filed its quarterly report on Form 10-Q for the first quarter of fiscal 2023.  Defendants Marsh and Middleton signed the report on behalf of Plug in their capacities as CEO and CFO, respectively. In the Form 10-Q, Plug described "Recent Developments" relating to its business. Among the various "Recent Developments" listed in the Form 10-Q, Plug listed a section titled "Inflation, Material Availability and Labor Shortages" stating:

> Most components essential to our business are generally available from multiple
> sources;  however,  we  believe  there  are  some  component  suppliers  and

manufacturing vendors, particularly those that supply materials in very limited supply worldwide, whose loss to us could have a material adverse effect upon our business and financial condition. We are mitigating these potential risks by introducing alternate system architectures that we expect will allow us to diversify our supply chain with multiple fuel cell, electrolyzer stack and air supply component vendors. In addition, we continue to invest in our supply chain to improve its resilience with a focus on automation, dual sourcing of critical components and localized manufacturing when feasible. We are also working closely with these vendors and other key suppliers on coordinated product introduction plans, product and sales forecasting, strategic inventories, and internal and external manufacturing schedules and levels; however, changes to our products designs or incorrect forecasting could present challenges to those strategies despite best efforts in leveraging supplier relationship and capabilities. Recent cost pressures from global energy prices and inflation have negatively impacted access to our key raw materials. In cases where we have single sourced suppliers (typically due to new technology and products) or there have been worldwide shortages due to global demand, we have worked to engineer alternatives in our product design or develop new supply sources while covering short- and medium-term risks with supply contracts, building up inventory, and development partnerships. However, if we, or the industry or economy at large, were to experience a recession and the demand for our product decreases, then we may have a large stock of pre-purchased inventory that could be unused and aging for a period of time.

96.     The statements in the immediately preceding paragraph were false and/or materially misleading by omission. For all the information provided about the risks of potential supply and material shortages, they said nothing of the fact that Plug Power was actively experiencing shortages and, at that, due to not paying its suppliers. Consequently, the foregoing cautionary language in Plug Power's quarterly report misled investors by concealing active ongoing supply shortages caused by Plug Power's failure to timely pay suppliers. This information was not disclosed but instead concealed by portraying risks of supply shortages as hypothetical in nature and stemming from reasons not relating to Plug Power's then existing cash flow troubles. Had this information been disclosed, investors would have known that Plug Power's timeline for hydrogen production and operations were actively being impeded by its cash flow difficulties, which was highly material to the market.

**1Q23 Press Release**

29

97.     On May 9, 2023, Plug Power issued a press release discussing its earnings for the first quarter of fiscal 2023.  Defendants Marsh and Middleton signed the press release on behalf of the Company.  The press release contained the following information:

> Plug's Georgia Liquid Green Hydrogen Plant Will Complete Commissioning and Continue to Ramp to Liquid Production throughout Q2: The plant has been brought online in less than a year since issuing the full EPC contract (engineering, procurement and construction contract), marking a new industry standard for the construction timeline of a liquid hydrogen plant.
>
> \*\*\*
>
> We expect to commission 200+ TPD by 4Q23 / 1Q24 and 500TPD by year-end 2025. Based on learnings in Georgia, presently it takes six months to get plants from commissioning to full production. Plug's green hydrogen generation network buildout should accelerate the energy transition while driving meaningful margin enhancement for Plug. To clarify the impact of this strategy, with a forecasted full year average customer demand of 65 tons of hydrogen fuel delivered per day in 2023, Plug would be able to achieve $100 million of gross margin improvement annually by sourcing all hydrogen internally from our plant network. We expect further gross margin expansion toward our financial targets as additional green hydrogen plants come online in 2024 and beyond.
>
> \*\*\*
>
> ***Georgia: Plug has made significant strides in ramping up liquid hydrogen production, with plans to begin production in the second quarter of 2023***. In less than a year since the arrival of crews on site, Plug is set to launch the first green hydrogen production plant in the United States, breaking the industry standard timeline of 48 months. . . .



This plant represents a major achievement as Plug is turning on the first commercial scale green hydrogen plant in the United States. Learnings from the construction and commercial operations at Georgia are proving to be invaluable as Plug optimizes future plant design, progresses with prospective electrolyzer customers, and diligence with strategic partners.

98.     The emphasized statements in the immediately preceding paragraph were false and/or materially misleading.  Plug Power had been and continuing to experience delays at the Georgia Plant due to shortages of supplies and faulty mechanical components. Third-party suppliers had stopped providing materials to Plug Power because Plug Power was not paying them.  Moreover, the mechanical equipment needed to successfully liquefy hydrogen gas was malfunctioning.  Senior management within Plug Power discussed these issues with the Officer Defendants when objecting to the timelines being provided to public investors.  Consequently, the Individual Defendants caused the Company to mislead investors when claiming that the

Georgia Plant was progressing as planned and that Plug Power would be producing 15 TPD during the second quarter when, in reality, that timeline was not feasible due to the obstacles the Company was currently facing.

**1Q23 Conference Call**

99.    On May 9, 2023, Plug Power held a conference call to discuss its first quarter earnings. Defendants Marsh, Middleton, and Shrestha participated in the call on behalf of the Company.

100.    During opening remarks, Defendant Marsh told investors:

[O]ur plants already producing gases hydrogen for our customers, and ***we expected to achieve full production by the end of June***. Although we always strive for greater speed, it's really worth noting, we accomplished what we've accomplished since issuing full notice to proceed under our EPC contract full production in just 48 weeks. This is a remarkable feat considering that conventional gas companies, and I was sitting at Syra, we've been listening to one CEO talking about 6 years, they usually estimate 4 years of a project of this scale.

Additionally, ***by the end of June, our Georgia plant, with the largest green hydrogen play in the world that utilizes electrolyzers. That's a significant achievement. . . .***

One of the real competitive advantage is the infrastructure we've established in Rochester and Vista, which enables us to support our business growth. And our customers really do recognize our ability to deliver our promises, thanks to the tools and facilities we possess. ***Our ability to construct green hydrogen plants is evident in Georgia***, and we plan to further demonstrate this in Texas and New York, which will eliminate any doubts about our capabilities. I'm going to be walking Georgia today, I'm excited. . . . [Emphasis added].

101.    The emphasized statements in the immediately preceding paragraph were false and/or materially misleading because they portrayed Plug Power's operations at the Georgia Plant in an unrealistic and overly optimistic light. Instead of truthfully disclosing that the Georgia Plant was behind schedule and at risk of not meeting its "end of June" production target, Marsh acted as if operations at the Georgia Plant were de-risked and proof positive of Plug Power's ability to produce liquid hydrogen.  Consequently, Marsh's statements concealed

the cash flow, supplier, and equipment issues currently plaguing the Georgia Plant that were actively impeding Plug's hydrogen production efforts.

**Analyst Day**

102.    On June 14, 2023, Plug Power hosted an "Analyst Day" from its Gigafactory in Rochester, New York.  Defendants Marsh and Middleton participated in the event on behalf of the Company.

103.    Defendant Marsh made the following statements during his prepared remarks at the "Analyst Day" event:

> And I think most of you know, I usually don't say things like that, but it's really touched me this week. And I think part of that probably has to do, I was in Georgia this week. And I'm going to -- I was at a CERAWeek all in the early March probably with many of you. And at CERAWeek, there were lots of traditional fossil fuel companies and traditional hydrogen companies talking about it takes 4 to 5 years to build a hydrogen plant. ***So I'm walking Georgia with the Head of S&P. We're down there. I'm down there to thank them for everything they've done and to really kind of enjoyed looking at this 15-ton per day liquid hydrogen plant with electrolyzers where there's nothing like in the world. And we're going to have another Analyst Day down there in August because we really want to bring you to Georgia in August.***
>
> ***And I walk that plan[t] and people tell me the experts told me it couldn't be done. . . .***
>
> ***So the important item is Georgia will be putting out liquid at the end of the month, and I can't wait.***  [Emphasis added].

104.    The emphasized statements in the immediately preceding paragraph were false and/or materially misleading.  At the time these statements were made, critical construction and commissioning steps at the Georgia Plant remained incomplete.  These statements were materially misleading because it assured investors that full production by June 2023 was imminent when, in fact, the plant would not begin producing liquid hydrogen until January 2024, seven months later.  Whenever the Company spoke about the Georgia Plant, it failed to mention any potential setbacks or risks of delay, despite the obvious likelihood of such problems given the compressed schedule.

105.    Instead, the Officer Defendants highlighted Plug Power's supposed ability to meet its promises and execute faster than industry norms, while at the same time touting the Company's "strong balance sheet."  In truth, Plug Power was struggling to pay contractors and vendors on time which is an issue that contributed to delays at the Georgia Plant. These omissions rendered the Company's assurances materially false and misleading. Moreover, Defendant Marsh admitted that industry experts had told him the project could not be completed on the accelerated timeline, yet he nevertheless continued to assure investors that production would occur by the end of June 2023.  These omissions and misstatements rendered these assurances materially false and misleading. The timeline was presented without qualification or disclosure of risks and was drastically shorter than the acknowledged four-year industry standard for completing comparable facilities.

**2Q23 Quarterly Report**

106.    On August 9, 2023, Plug Power filed its quarterly report on Form 10-Q for the second quarter of fiscal 2023.  Defendants Marsh and Middleton signed the report on behalf of Plug Power in their capacities as CEO and CFO, respectively.

107.    In the Form 10-Q, Plug Power described "Recent Developments" relating to its business.  Among the various "Recent Developments" listed in the Form 10-Q, Plug Power listed a section titled "Inflation, Material Availability and Labor Shortages" stating:

> Most components essential to our business are generally available from multiple sources; however, we believe there are some component suppliers and manufacturing vendors, particularly those suppliers and vendors that supply materials in very limited supply worldwide or supply commodities that have high degree of volatility, whose loss to us or general unavailability could have a material adverse effect upon our business and financial condition. Furthermore, global commodity pricing is very volatile and influenced by political events and worldwide economic trends, which may impact our sourcing strategies resulting in adverse impacts on our business and financial condition. We are mitigating these potential risks by introducing alternate system architectures that we expect will allow us to diversify our supply chain with multiple fuel cell, electrolyzer stack and air supply component vendors. In addition, we continue to invest in our supply chain to improve its resilience with a focus on automation, dual sourcing of critical components and localized

manufacturing when feasible. We are also working closely with these vendors and other key suppliers on coordinated product introduction plans, product and sales forecasting, strategic inventories, and internal and external manufacturing schedules and levels; however, changes to our products designs, new product serviceability trends, or incorrect forecasting could present challenges to those strategies despite best efforts in leveraging supplier relationship and capabilities. Recent cost pressures from global energy prices and inflation have negatively impacted access to our key raw materials. Additionally, our regionally diverse supply chain could result in price shifts from one region to another region that may affect our costs and strategic initiatives. In cases where we have single sourced suppliers (typically due to new technology and products or worldwide shortages due to global demand), we work to engineer alternatives in our product design or develop new supply sources while covering short- and medium-term risks with supply contracts, building up inventory, and development partnerships. However, if we, or the industry or economy at large, were to experience a recession, then we may have a large stock of pre-purchased inventory that could be unused and aging for a period of time. We continue to take proactive steps through our supply chain team to limit the impact of suppliers challenges generally and we continue to work closely with our suppliers and transportation vendors to ensure availability of products and implement other cost savings initiatives.

108. The statements in the immediately preceding paragraph were false and/or materially misleading by omission. For all the information the Company provided about the risks of potential supply and material shortages, it said nothing of the fact that it was actively experiencing shortages and, at that, due to not paying its suppliers. Consequently, the foregoing cautionary language in Plug Power's quarterly report misled investors by concealing active ongoing supply shortages caused by Plug Power's failure to timely pay suppliers. This information was not disclosed but instead concealed by portraying risks of supply shortages as hypothetical in nature and stemming from reasons not relating to Plug Power's then existing cash flow troubles. Had this information been disclosed, investors would have known that Plug Power's timeline for hydrogen production and operations were actively being impeded by its cash flow difficulties, which was highly material to the market.

**2Q23 Press Release**

109.    On August 9, 2023, Plug Power issued a press release discussing its earnings for the second quarter of fiscal 2023.  Defendants Marsh and Middleton signed the press release on behalf of the Company.  The press release contained the following information:

> Plug's Georgia green hydrogen plant reaching major milestone: We are continuing to optimize and ramp-up the plant. ***Final commissioning activities are underway to reach 17.5 tons per day (TPD) of production on site during Q3 2023.*** As Georgia produces at its full capacity, this is expected to cut our fuel margin loss by as much as half from Q2 to Q4 2023. . . . ***As production from our Georgia plant is utilized in the 2H 23, and we recommission the hydrogen plant currently under unplanned maintenance, we should see notable improvement in fuel margin beginning in the second half of the year***. Emphasis added].

110.    The emphasized statements in the immediately preceding paragraph were false and/or materially misleading.  Plug Power had been and continuing to experience delays at the Georgia Plant due to shortages of supplies and faulty mechanical components. Third-party suppliers had stopped providing materials to Plug Power because Plug Power was not paying them.  Moreover, the mechanical equipment needed to successfully liquefy hydrogen gas was malfunctioning.  Senior management within Plug Power discussed these issues with certain defendants when objecting to the timelines being provided to public investors.  Consequently, Defendants misled investors when claiming that the Georgia Plant was progressing as planned and that Plug would be producing 17.5 TPD during the third quarter when, in reality, that timeline was not feasible due to the obstacles the Individual Defendants were currently facing.

**2Q23 Conference Call**

111.    On August 9, 2023, Plug Power held a conference call to discuss its second quarter earnings.  Defendants Marsh and Middleton participated in the call on behalf of the Company.

112.    After missing the June 2023 deadline without providing any substantive explanation, during Plug Power's second quarter earnings call, the Individual Defendants continued to assure investors that production was imminent:

So again, I think we're fairly -- look, *we feel very confident that we're going to be producing liquid in Q3. Right now, we're essentially going through ramping up electrolyzer, right? We've actually tried to electrolyze this one. You know that we've been producing gaseous hydrogen there with our gaseous hydrogen plant. We're in a process of actually ramping up our liquefiers in a process of cooling down the liquefaction trains*.

So again, that's why we're hosting our Analyst Day there on August 23, right, so that we can actually show to you all exactly what's happening there and what's going on. So at the moment here, are we producing liquid? *We're not producing liquid today, but we are essentially ramping up the electrolyzer on path to be able to produce that liquid*. And Jeff, one of the key things here, right, I do want to stress this one particular point is, obviously, look, and I'm just going to take the point that's an elephant in the room, if you would. We clearly recognize that we've been 3 to 6 months behind than what we originally wanted it to be. But having said that, this plant is still coming online in 12 months since we actually issued the EPC contract, number one.

*. . . So long story and a quick comment, we are going to be producing liquid here in the month of August*. We're very much looking forward to hosting you all on August 23, and we're essentially wrapping up the plant at this point in time. . . .

And again, one of the things we want to make sure, right? So for us, getting Georgia up and running and getting production in Georgia, it also has to be done the right way and really leverage that learning as we start to think about building our plant in Texas, as we're building our plant in New York as well, right? So that's essentially what I would say. And also, another thing you need to kind of keep in mind, right, is we've been pushing just so you guys know, in order to be able to get this plant built in 12 months versus what the industry average of 48 months is, we've actually been pushing folks, but it's the month of July and August.

And on some level, the productivity does go down because it's 100 degrees outside and people have to actually take break and really be able to cool down and then go back on site. And just to give you a sense, the team was on site at 4:30 a.m. today, right, just to make sure that things were happening. So that's another factor. There's nothing anyone can really do about that, reduce productivity in the month of June, July and August in Georgia, and that certainly has played a bit of an impact here as well. . . . [Emphasis added].

113.    The emphasized statements in the immediately preceding paragraph were false and/or materially misleading.  At the time these statements were made, critical construction and commissioning steps at the Georgia Plant remained incomplete.   The Individual Defendants' statements not only attributed the delay to summer heat and utilizing learnings, something they should have foreseen or accounted for with all the experts on the project, but

also falsely suggested that full production was only weeks away and subsequently completed when in reality the facility did not begin producing liquid hydrogen until January 2024, seven months later. Furthermore, this timeline was presented without qualification of disclosure of risks or setbacks and was drastically shorter than industry norm for completing comparable facilities.

**Analyst Day**

114.    On August 23, 2023, Plug Power hosted an "Analyst Day" event in person in Georgia to discuss the Company's Georgia Plant.  Defendant Marsh participated in the event on behalf of the Company.

115.    In advance of the event, Plug Power issued a press release stating:

LATHAM, N.Y., Aug. 23, 2023 (GLOBENEWSWIRE) -- Plug Power Inc. (NASDAQ: PLUG), a global leader in comprehensive hydrogen solutions for the green hydrogen economy, today will host its Analyst Day *showcasing the accomplishments to date of its 15 ton per day (TPD) liquid green hydrogen plant in Camden County, Georgia*. Plug will share how the Georgia plant strengthens Plug's long-term position as the global leader in green hydrogen production and supplier of electrolyzers. The day's agenda will include a tour of the hydrogen plant. . . . The insights Plug gained designing and constructing this plant are expected to result in design optimization and lower capital expenditure for the company's other plants currently under construction. As the Georgia plant's hydrogen production ramps up, it is anticipated to improve Plug's fuel margin meaningfully from Q2 to Q4 2023.  [Emphasis added].

116.    During the presentation, Plug Power provided a slide claiming that the Georgia plant would "cut our fuel margin loss by as much as half from Q2 to Q4 2023."  The slide is below:

38



## Anticipated Impact of Plug's Green Hydrogen Strategy

As Georgia produces at its full capacity, this is expected to cut our fuel margin loss by as much as half from Q2 to Q4 2023

Plug expects its green hydrogen network to produce hydrogen at a cost that is one-third of our third-party purchases

By sourcing all hydrogen internally from its plant network, Plug is expected to achieve up to $100 million of gross margin improvement annually, based on a forecasted full year average customer demand of 65 tons of hydrogen per day.



Georgia Green Hydrogen Plant – April 2023

117.    The emphasized statements and slide in the immediately preceding paragraphs were false and/or materially misleading.  The Georgia Plant was not actively producing 15 TPD of hydrogen but instead was continuing to experience delays due to shortages of supplies and faulty mechanical components.  Third-party suppliers had stopped providing materials to Plug Power because Plug Power was not paying them.  Moreover, the mechanical equipment needed to successfully liquefy hydrogen gas was malfunctioning.  Senior management within Plug Power discussed these issues when objecting to the timelines being provided to public investors.  Consequently, the Individual Defendants caused the Company to mislead investors when claiming that the Georgia Plant was progressing as planned and that Plug Power would be successfully cutting its margin losses before year-end when, in reality, that timeline was not feasible due to the obstacles the Company was currently facing.

**Annual Symposium**

118.    On October 11, 2023, Plug Power hosted its fifth annual symposium in person at its Vista manufacturing facility in Slingerlands, New York.  During the symposium, various

Plug Power executives presented on the Company's operations, including its efforts to generate hydrogen.

119.    During the event, Defendant Marsh again reassured investors that completion of the Georgia Plant was imminent, stating:

> And on hydrogen, in 2020, we had nothing. There's dream. I went back and look at 2020 slides, which when I look at and found out we're beating -- the 2019 slides, we're beating the numbers. We told folks where we're going to be in 2019. I think we said we were going to be $1 billion of revenue in 2024. We're going to do that this year. But also, we talked about -- we're thinking about how we would build hydrogen plants. We have a plant in Tennessee. ***I wish I could tell you, Georgia was putting out liquid today, somewhere between 11/15 and 12/31, when the coal [sic] boxes – coal [sic] box is finally commissioned, where we're going through a process now of drying it out***. It's a $100 million piece of equipment. We really want to make sure it's done right. But that work is about to be completed. It's the biggest electrolyzer plant in the world.

> We've learned, and it's -- every day, I learn a little bit more, we had to test 8,000 pipes in this facility. We had to test 3,000 electrical loops to make sure everything was right. We're drying out coal boxes. ***It hasn't been easy, but I can tell you, Sanjay, myself, Tim Cortes, have become experts in what it takes to build, which is the easy part, and really what it takes to commission***. Emphasis added].

120.    The emphasized statements in the immediately preceding paragraph were materially misleading.  By the time these statements were made, Plug Power had already missed both the June 2023 deadline and its subsequent August 2023 assurances, yet the Company failed to disclose that these earlier targets had been unattainable from the start. Instead, the Company shifted their timeline once again, presenting the project as in its final steps and on track for year-end completion. In truth, critical commissioning remained unfinished, and the Georgia Plant did not begin producing liquid hydrogen until January 2024, seven months past the original deadline and even beyond the revised August 2023 and year-end promises.  By continuing to provide moving targets without acknowledging the infeasibility of the compressed schedule, the Individual Defendants caused the Company to mislead investors into believing Plug Power's aggressive timeline remained credible when it was not.

**3Q23 Quarterly Report**

121.    On November 9, 2023, Plug Power filed its quarterly report on Form 10-Q for the third quarter of fiscal 2023.  Defendants Marsh and Middleton signed the report on behalf of Plug Power in their capacities as CEO and CFO, respectively.

122.    In the Form 10-Q, Plug Power described "Recent Developments" relating to its business.  Among the various "Recent Developments" listed in the Form 10-Q, Plug Power listed a section titled "Inflation, Material Availability and Labor Shortages" stating:

> Most components essential to our business are generally available from multiple sources; however, we believe there are some component suppliers and manufacturing vendors, particularly those suppliers and vendors that supply materials in very limited supply worldwide or supply commodities that have high degree of volatility, whose loss to us or general unavailability could have a material adverse effect upon our business and financial condition. Furthermore, global commodity pricing has been volatile and may be influenced by political events and worldwide economic trends, which may impact our sourcing strategies resulting in adverse impacts on our business and financial condition. We are mitigating these potential risks by introducing alternate system architectures that we expect will allow us to diversify our supply chain with multiple fuel cell, electrolyzer stack and air supply component vendors. For example, although we believe the current hydrogen supply challenge is a transitory issue, we have experienced supply chain issues relating to the availability of hydrogen, including but not limited to suppliers utilizing force majeure provisions under existing contracts, which has negatively impacted the amount of hydrogen we have been able to provide under certain of our supply and other agreements. In addition, we continue to invest in our supply chain to improve its resilience with a focus on automation, dual sourcing of critical components and localized manufacturing when feasible. We are also working closely with these vendors and other key suppliers on coordinated product introduction plans, product and sales forecasting, strategic inventories, and internal and external manufacturing schedules and levels. However, ongoing changes to, and evolution of, our products designs such as simultaneous design/build efforts and new product serviceability trends, or incorrect forecasting or updates to previously forecasted volumes could present challenges to those strategies despite best efforts in leveraging supplier relationships and capabilities. With respect to production, although we have experienced less cost pressures from global energy prices and inflation, those factors could rise again and there could be a negative impact to our key raw materials. Additionally, our regionally diverse supply chain could result in price shifts from one region to another region that may affect our costs and strategic initiatives. In cases where we have single sourced suppliers (typically due to new technology and products or worldwide shortages due to global demand),

we work to engineer alternatives in our product design or develop new supply sources while covering short- and medium-term risks with supply contracts, building up inventory, and development partnerships. However, if we, or the industry or economy at large, were to experience a recession, then we may have a large stock of pre-purchased inventory that could be unused and aging for a period of time. In addition, during the fourth quarter of 2023, we are continuing discussions with suppliers to modify terms of our supply agreements, which may impact the timing of when we receive shipments of certain supplies or result in other supply chain issues. However, we continue to take proactive steps through our supply chain team to limit the impact of suppliers challenges generally and we continue to work closely with our suppliers and transportation vendors to ensure availability of products and implement other cost savings initiatives. With respect to its service business, the Company has experienced inflationary increases in labor, parts and related overhead. Accordingly, the Company increased its estimated projected costs to service fuel cell systems and related infrastructure, which resulted in an increase in the provision for loss contracts related to service during the third quarter of 2023. If these trends continue, we may have to record additional service loss provisions in the future. We anticipate bookings and revenue will be uneven in the near-term while we pursue sales opportunities and seek to build our liquefier backlog.

123. The statements in the immediately preceding paragraph were false and/or materially misleading by omission. For all the information the Company provided about the risks of potential supply and material shortages, they said nothing of the fact that Plug Power was actively experiencing shortages and, at that, due to not paying its suppliers. Consequently, the foregoing cautionary language in Plug Power's quarterly report misled investors by concealing active ongoing supply shortages caused by Plug Power's failure to timely pay suppliers. This information was not disclosed but instead concealed by portraying risks of supply shortages as hypothetical in nature and stemming from reasons not relating to Plug Power's then existing cash flow troubles. Had this information been disclosed, investors would have known that Plug Power's timeline for hydrogen production and operations were actively being impeded by its cash flow difficulties, which was highly material to the market.

**3Q23 Press Release**

124. On November 9, 2023, Plug Power issued a press release discussing its earnings for the third quarter of fiscal 2023. Defendants Marsh and Middleton signed the press release on behalf of the Company. The press release contained the following information:

42

Georgia green hydrogen plant nearing major milestone: ***We are completing the final step of the commissioning process for the liquefiers/cold box. Liquid production is anticipated between November 15th and year-end***. [Emphasis added].

125.    The emphasized statements in the immediately preceding paragraph were materially misleading.  By the time these statements were made, Plug Power had already missed both the June 2023 deadline and its subsequent August 2023 assurances, yet the Company failed to disclose that these earlier targets had been unattainable from the start. Instead, the Company shifted their timeline once again, presenting the project as in its final steps and on track for year-end completion. In truth, critical commissioning remained unfinished, and the Georgia Plant did not begin producing liquid hydrogen until January 2024, seven months past the original deadline and even beyond the revised August 2023 and year-end promises.  By continuing to provide moving targets without acknowledging the infeasibility of the compressed schedule, the Individual Defendants caused the Company to mislead investors into believing Plug Power's aggressive timeline remained credible when it was not.

**3Q23 Conference Call**

126.    On November 9, 2023, Plug Power held a conference call to discuss its third quarter earnings.  Defendants Marsh and Middleton participated in the call on behalf of the Company.

127.    During the call, Defendant Marsh stated:

To service our customers, Plug has been moving hydrogen from the West Coast to the East Coast. This has been a yeoman's effort and has been accomplished while reducing the core cost of hydrogen compared to the second quarter. Good news is the network has now stabilized and many of these planned outages have subsided, plus additional capacity will be coming online. We expect our Tennessee plant will be back online producing hydrogen by the end of the year.

This plant when fully operational provides about 20% of our production needs. One of our major suppliers is upgrading one of their facilities to allow the plant to operate at full nameplate capacity in the coming months. The plant output has been producing between 0% to 25% of capacity. ***We are continuing to see***

*progress at our Georgia plant, and we are finishing the last step in the construction process, commissioning the liquefier. We expect the plant to be online by year-end*.  [Emphasis added].

128.   The emphasized statements in the immediately preceding paragraph were materially misleading.  By the time these statements were made, Plug Power had already missed both the June 2023 deadline and its subsequent August 2023 assurances, yet the Company failed to disclose that these earlier targets had been unattainable from the start. Instead, the Company shifted their timeline once again, presenting the project as in its final steps and on track for year-end completion. In truth, critical commissioning remained unfinished, and the Georgia Plant did not begin producing liquid hydrogen until January 2024, seven months past the original deadline and even beyond the revised August 2023 and year-end promises.  By continuing to provide moving targets without acknowledging the infeasibility of the compressed schedule, the Individual Defendants caused the Company to mislead investors into believing Plug Power's aggressive timeline remained credible when it was not.

## THE TRUTH EMERGES

129.   On August 9, 2023, during Plug Power's second quarter earnings call, it was clear that the Georgia Plant has not been completed by the second quarter as originally touted by Plug Power. Instead, Plug Power announced that "we are going to be producing liquid here in the month of August.  We're very much looking forward to hosting you all on August 23, and we're essentially wrapping up the plant at this point in time."  Plug Power disclosed $45 million in startup and maintenance costs, leading to adjusted EPS/EBITDA of negative $0.37/share and negative $171.5 million compared to analyst estimates of negative $0.27 per share and negative $87.3 million.

130.   On August 9, 2023, Plug Power's stock price closed at $10.75 per share. On August 10, 2023, Plug Power's stock price closed at $9.05 per share on unusually high volume

(69,407,194).  Between August 9, 2023 and August 10, 2023, Plug Power's stock price dropped approximately 15.8%.  The approximate 15.8% decline in Plug Power's stock price coincides with and is attributable to Plug Power's inadvertent disclosure in its August 2023 earnings call, after the market opened, that it failed to meet its June 2023 deadline for the completion of its Georgia Plant.  As the market interpreted and evaluated the Company's disclosures in the days that followed, Plug Power's stock price continued to decline.

131.    On November 9, 2023, after missing both its June 2023 and August 2023 deadlines, Plug Power announced: "We are completing the final step of the commissioning process for the liquefiers/cold box. Liquid production [at the Georgia Plant] is anticipated between November 15th and year-end."  Plug Power's quarterly report include a going concern qualification alongside significant misses on adjusted EPS and EBITDA (-$0.45 vs. -$0.31 and -$204m vs. -$128m).

132.    On November 9, 2023, Plug Power's stock price closed at $5.93 per share.  On November 10, 2023, Plug Power's stock price closed at $3.53 per share on unusually high volume (223,395,250).  Between November 9, 2023, and November 10, 2023, Plug Power's stock price dropped approximately 40.5%.  As the market interpreted and evaluated the Company's disclosures in the days that followed, Plug Power's stock price declined sharply. The approximate 40.5%. decline in Plug Power's stock price coincides with and is attributable to Plug Power's disclosure that it had failed to meet both the June 2023 and August 2023 deadline for the completion of the Georgia Plant and that now the Georgia Plant was anticipated to be completed between November 15, 2023 and year-end.

133.    On November 16, 2023 and January 10, 2024, analysts at J.P. Morgan and Baptista Research (among others) issued reports on Plug Power voicing concerns over Plug Power's cash burn and inability to produce hydrogen, including at Georgia Plant.  Specifically, on November 16, 2023, J.P. Morgan issued a report after meeting with Defendant Middleton

"to discuss the company's outlook post-3Q earnings, options to strengthen its balance sheet, and path for margin improvement." J.P. Morgan highlighted in its report that the Georgia Plant was still not operational and would need to commence operations before Plug Power's margins could being improving. On November 15, 2023, Plug Power's stock price closed at $4.35/share before declining to $3.87/share on November 20, 2023.

134. On January 10, 2024, *Baptista Research* wrote that "The delays experienced in the Georgia facility indicate that there might be unforeseen operational challenges and learning curves that could potentially delay other projects, affecting the company's short-term production and revenue targets." On January 10, 2024, Plug Power's stock price closed at $4.04/share before declining to $2.42/share on January 18, 2024. These declines were causally related to the misrepresentations and omissions; indeed, inflation in the stock price dissipated as new information entering the market and revealing Plug Power's operations to be further behind schedule than previously represented.

135. On January 17, 2024, *Seeking Alpha* published a report reiterating the downgrades and build-out concerns, including a report released by Morgan Stanley earlier that day and noting that "Morgan Stanley analyst Andrew Percoco maintained his Underweight rating and $3 price target, anticipating downside to Plug's (PLUG) $2.1B revenue and 25% gross margin guidance for FY 2024 announced during its Q4 earnings call" and that "further delays at Plug's green hydrogen production facility in Georgia could be announced, which would add to pressure on the growth and profitability profile of the company's green hydrogen business model." By this point in time, Plug Power's stock price had fallen to $2.74/share.

136. The Individual Defendants initially touted a June 2023 completion date for the Georgia Plant, but when that deadline passed unmet, Plug Power's stock price declined. Defendants then announced a revised completion date of August 2023, which likewise went unmet, prompting yet another postponement and further stock price decline. In sum, the

concealment of risks and delays surrounding the Georgia Plant misled investors and caused substantial losses. It was not until January 23, 2024, seven months from the originally promised date, that Plug Power finally announced the completion of the Georgia Plant in a press release. To analysts and investors, Plug Power and its executive management had already lost credibility by this point, as noted by Seaport Research Partners on February 6, 2024. In pertinent part, *Seaport Research* wrote that: "Downgrading to Neutral: triage and then rehab to be a lengthy process; we'll be waiting for stronger vital signs on profitability . . . . In this stage, we believe PLUG should focus on rebuilding its business model and guidance credibility and, as the central thrust of that mission, demonstrating progress toward profitability."

## DAMAGE TO THE COMPANY

### Securities Class Action

137. On March 22, 2024, the Securities Class Action complaint was filed in the United States District Court for the Northern District of New York against the Company and the Officer Defendants. The complaint alleges violations of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

138. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

### Unjust Compensation

139. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

140. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and

47

administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

141. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

142. In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

143. The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

144. The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## DERIVATIVE AND DEMAND FUTILITY

145. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Individual Defendants' violations of the law, their breaches of fiduciary duties, and other wrongful conduct as alleged herein.

48

146.    Plaintiff is a current owner of Plug Power stock and has owned Plug Power stock at relevant times hereto.  Plaintiff understands his obligation to hold Plug Power stock throughout the pendency of this action and is prepared to do so.

147.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

148.    Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

149.    At the time this suit was filed, the Board was comprised of ten (10) members, consisting of Defendants Marsh, Bonney, Helmer, Joggerst, Kenausis, Mahtani, McNamee, and Willis (*i.e.*, the Director Defendants) and non-parties Colin Angle ("Angle") and Jose Luis Crespo ("Crespo," together with the Director Defendants, the "Current Directors").  Thus, Plaintiff is required to show that a majority of the Current Directors, *i.e.*, five (5), could not exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

## THE CURRENT DIRECTORS ARE
## NOT INDEPENDENT OR DISINTERESTED

**The Director Defendants Face a Substantial Likelihood of Liability**

150.    The Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein.  Because of their advisory, managerial, and directorial positions within the Company, the eight (8) Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

151.    The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

152.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

153.    Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

154.    As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

155.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

156. Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

157. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

158. Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for the Company for any of the misconduct alleged herein.

**Non-Party Crespo**

159. Non-Party Crespo is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent. As such, Non-Party Crespo cannot independently consider any demand to sue themselves for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

160. As CEO, Non-Party Crespo also fails the stock exchange bright-line independence test and cannot, therefore, be considered independent. As such, Non-Party Crespo could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Non-Party Crespo is therefore futile.

161. In addition, Non-Party Crespo receives lucrative compensation in connection with their employment with the Company. Non-Party Crespo is not independent from the

directors serving on the Compensation Committee as they are responsible for evaluating and determining the compensation of the Executive Officers. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its Executive Officers.  Because of his status as an inside director, and the concomitant substantial compensation he receives, Non-Party Crespo could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

**Defendant Marsh**

162.    Defendant Marsh previously served as the CEO of the Company, having held the position from April 2008 through March 2026, and now continues to serve on the Company's Board as Chairman. Accordingly, Defendant Marsh fails the NASDAQ independence standards and cannot, therefore, be considered independent.

163.    Defendant Marsh also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as the main perpetrator of the wrongdoing alleged herein, Defendant Marsh is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

164.    In addition, Defendant Marsh receives lucrative compensation in connection with their employment with the Company. Defendant Marsh is not independent from the directors serving on the Compensation Committee as they are responsible for evaluating and determining the compensation of the Executive Officers. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its Executive Officers.  Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Marsh could not consider

a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

165. Because of Defendant Marsh's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Marsh is unable to comply with his fiduciary duties and prosecute this action.

**Defendants Willis and Bonney**

166. Defendant Willis has a longstanding business relationship with Defendant Bonney, stemming from at least 1993. In particular, Defendant Willis served as President of Zygo Corporation from 1992 through 1999 and as a director of the same from 1992 to 2000. At the same time, Defendant Bonney held executive roles – Vice President and CFO and Chief Operating Officer ("COO") – at Zygo Corporation from March 1993 through August 1999.

167. As such, Defendants Willis and Bonney have built a longstanding professional relationship with one another, spanning over thirty (30) years, built upon mutual respect. As a result, neither Defendant Willis nor Defendant Bonney could independently consider a demand to sue one another.

**Defendants Bonney, Helmer, Kenausis, Mahtani, and Willis**

168. Defendants Bonney, Helmer, Kenausis, Mahtani, and Willis served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

169. Defendants Bonney, Helmer, Kenausis, Mahtani, and Willis breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's

SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants Bonney, Helmer, Kenausis, Mahtani, and Willis face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Additional Reasons Demand is Futile**

170.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Directors have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

171.    The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

172.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the

responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

173.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board.  They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

174.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

175.    Publicly traded companies, such as Plug Power, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses.  However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Current Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event.

55

176. Accordingly, each of the Director Defendants, and at least a majority of the Current Directors, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Current Directors is futile and, thus, excused.

## CLAIMS FOR RELIEF

## COUNT I

## (Against the Individual Defendants for Breach of Fiduciary Duty)

177. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

178. Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Plug Power's business and affairs.

179. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable enquiry, oversight, and supervision.

180. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Plug Power.

181. In breach of their fiduciary duties owed to Plug Power, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact. In particular, the Individual Defendants misrepresented and/or failed to disclose that: (i) the Company was not paying its suppliers; (ii) as a result, the Company's suppliers were delaying providing the Company with critical components for the Georgia Plant, causing supply shortages; (iii) these supply shortages were causing the Company's Georgia Plant to experience delays; (iv) as a result of the foregoing, the Georgia Plant would likely miss its production target for the end of June; and

(v) the Georgia Plant would not be ready to start producing hydrogen until January 2024. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

182. The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

183. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Plug Power's securities.

184. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

185. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, Plug Power has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT II

### (Against the Individual Defendants for Unjust Enrichment)

186. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

187.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Plug Power.

188.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Plug Power that was tied to the performance or artificially inflated valuation of Plug Power, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct, as detailed *supra*.

189.    Plaintiff, as a shareholder and representative of Plug Power, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from any insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## COUNT III

### (Against the Individual Defendants for Waste of Corporate Assets)

190.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

191.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company, as detailed *supra.*

192.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Plug Power to waste valuable corporate assets, to incur many millions of dollars in legal liability and/or

costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company.

193. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

## COUNT IV

### (Against the Individual Defendants for Abuse of Control)

194. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

195. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Plug Power, for which they are legally responsible.

196. As a direct and proximate result of the Individual Defendants' abuse of control, Plug Power has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT V

### (Against the Individual Defendants for Gross Mismanagement)

197. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

198. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Plug Power in a manner consistent with the operations of a publicly-held company.

199. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Plug Power has sustained and will continue to sustain significant damages.

200.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

B.     Finding the Individual Defendants liable for breaching their fiduciary duties owed to the Company and for unjust enrichment, abuse of control, gross mismanagement, and committing corporate waste;

C.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein, including but not limited to removing and replacing its officers and directors;

D.     Awarding damages to the Company for the harm the Company suffered as a result of the Individual Defendants' wrongful conduct;

E.     Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

F.     Awarding such other and further relief as is just and equitable.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: May 7, 2026

**GAINEY McKENNA & EGLESTON**

By:     */s/ Gregory M. Egleston*
Gregory M. Egleston
Thomas J. McKenna
Christopher M. Brain
260 Madison Avenue, 22nd Floor

New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: egleston@gme-law.com
Email: tjmckenna@gme-law.com
Email: cbrain@gme-law.com

**VERIFICATION**

I, BERND H. REIMANN, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Plug Power, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Plug Power, Inc. common stock at all relevant times.

Bernd H Reimann
BERND H. REIMANN